## COMMONWEALTH *vs.* VICTOR E. SMITH.

Berkshire. January 5, 2007. - April 30, 2007.

Present: MARSHALL, C.J., IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Instructions to jury, New trial, Assistance of counsel, Capital case. *Intoxication. Homicide. Malice. Intent. Constitutional Law,* Assistance of counsel.

A criminal defendant did not demonstrate a substantial likelihood of a miscarriage of justice in the judge's instructions to the jury at a murder trial on their use of evidence of intoxication when considering the issues of deliberate premeditation, extreme atrocity or cruelty, and malice [16-20], and the judge's failure to mention that the jury could consider the defendant's consumption of drugs in conjunction with alcohol did not create a substantial likelihood of a miscarriage of justice, where it was highly unlikely that the jury did anything but consider the defendant's state of sobriety based on the combined effects of drugs and alcohol [20].

A trial court judge did not err in denying, without a hearing [24], a criminal defendant's motion for a new trial, where counsel's decision, after investigation, to forgo a "diminished capacity" defense based on mental disease or defect and the defendant's medical history was not manifestly unreasonable [20-22]; where the defendant failed to demonstrate any ineffective assistance with regard to counsel's investigation of alleged neurological issues [22], or the theory of the case as advanced at trial [23-24]; and where the trial judge's failure to give a cautionary instruction as to witness credibility did not give rise to a substantial likelihood of a miscarriage of justice, given the overwhelming evidence against the defendant [24].

INDICTMENT found and returned in the Superior Court Department on March 27, 2000.

The case was tried before *Constance M. Sweeney,* J., and a motion for a new trial, filed on July 2, 2003, was heard by her.

*Charles K. Stephenson* for the defendant.

*David F. Capeless,* District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal, he alleges error in (1) the judge's

instruction on the use of evidence of intoxication when considering the issues of deliberate premeditation, extreme atrocity or cruelty, and malice, and (2) the denial of his motion for a new trial, based primarily on an assertion of counsel's failure to investigate adequately a "diminished capacity" defense, without an evidentiary hearing. He also asks us to reduce the degree of guilt found by the jury pursuant to our power under G. L. c. 278, § 33E. We affirm the conviction and decline to order a reduction in the degree of guilt or order a new trial.

1. *Background.* The defendant and Francis Albis[1] spent the evening of March 4, 2000, "bar hopping" in North Adams. Between approximately 8 P.M. on March 4 and 2 A.M. on March 5, they visited three bars and each consumed approximately ten drinks — some were beers and some were mixed drinks. The two men showed signs of alcohol consumption, but neither appeared intoxicated. Early in the evening the defendant also took two Artane pills, a medication prescribed for him for Tourette's Syndrome, a developmental abnormality that affects the involuntary movements controlled by the frontal networks of the brain.[2]

While inside the last bar visited that night, they encountered David Champagne, the victim. The defendant became angry and upset. He told Albis that he wanted to "kick [Champagne's] ass" for beating up his cousin. The defendant and Albis told several people words to the effect that they wanted revenge for what Champagne did to "their"[3] cousin.

At "last call," Champagne left the bar. The defendant and Albis left about three minutes later. They hailed the driver of a nearby parked car, who, coincidentally, happened to be Champagne, and asked him for a ride home. Champagne said he was going their way. Witnesses observed that their conversa-

---

[1]Francis Albis pleaded guilty to manslaughter for his involvement in the killing and was sentenced to a term of from five to six years in the State prison before he testified at Smith's trial.

[2]Dr. Paul Spiers, the defendant's expert neuropsychologist, testified that Tourette's Syndrome often produces abnormal tics because the affected area of the brain is not fully developed. Many persons with Tourette's Syndrome suffer from coprolalia, characterized by a sudden onset of cursing or grunting. Touretters also tend to have obsessive-compulsive disorders and do or say things repeatedly.

[3]The defendant and Albis were related only by marriage.

tion appeared amicable, but Albis noticed the defendant becoming upset and told him he did not want any trouble. Albis sat in the front passenger seat; the defendant sat in the back seat.

While they were traveling the defendant angrily asked Champagne, "Do you know who I am?" Champagne said he did not. The defendant said, "You go with my cousin . . . you beat her up." Champagne denied the accusation. The defendant continued speaking angrily at Champagne after he parked his car near the adjacent apartment buildings where Albis and the defendant lived. Champagne and Albis got out of the car. Champagne told Albis he wanted the defendant out of his car. Albis grabbed Champagne and told him he did not want to get involved.

The defendant got out of the car and attacked Champagne. He struck Champagne several times in the back. Champagne fell and the defendant stood over him, striking him repeatedly. Albis eventually pulled the defendant off Champagne because the defendant was landing all the blows. He said Champagne had "had enough." At that point Albis noticed for the first time that the defendant had a knife in his hand. Early in the evening the defendant had mentioned he was carrying a knife. Albis was worried about what just happened. He walked to the upstairs tenants' apartment in his apartment building because the lights were on. As he walked past Champagne he could hear gurgling. The defendant followed Albis.

Inside the apartment the defendant repeatedly asked one of three tenants if he recognized him, to which the tenant repeatedly replied, "Yes." Eventually he said, "No," just to appease the defendant. The defendant then grabbed the man, pushed him against a wall, and said boastfully he "just did a guy" and was not afraid "to do another one." The defendant held out his knife and said he stabbed the man fifteen times because he molested a family member. Albis said he was going to telephone the police. The defendant told him not to, and said he would handle it. He then told Albis and the three tenants he would "get away with it" because he had Tourette's Syndrome. The three tenants thought the defendant was drunk. Albis and the defendant went downstairs to Albis's apartment where they argued after Albis again mentioned telephoning the police.

Albis's wife, Melissa, and one of the upstairs tenants went outside to look for a body, which they thought they saw in the distance. When they returned, Melissa Albis tried to telephone police, but the defendant stopped her. He assured her that her husband had nothing to do with the killing, and that he would get away with it because he had Tourette's Syndrome. When she insisted on telephoning police, the defendant reminded her that he had just killed someone and would have no problem killing her or her five children.

The defendant left the Albises' apartment and returned with his wife and stepbrother. He washed the knife, and told his wife to make sure Melissa Albis did not go anywhere. He then told Melissa Albis in a threatening tone, "You know nothing, you seen nothing and you heard nothing."

At approximately 7 A.M. on March 5, 2000, a North Adams police officer responded to a report about a man lying on the ground at 85 North Holden Street, and discovered Champagne's body. It was a "stone's throw" from Albis's apartment. An autopsy revealed twenty-two stab wounds. He was stabbed in the back thirteen times, puncturing his left lung four times and his right lung once. He was stabbed in the front of the chest four times, resulting in two lacerations of the liver. Champagne bled to death as a result of the injuries to these internal organs. In addition, he was stabbed through the left side of his neck; through his left cheek and tongue; and all the way through his left shoulder. Three of his wounds were defensive. The wounds were consistent with the defendant's knife.

Police interviewed people in the last bar where Champagne had been, and were directed to Albis and the defendant. Police questioned the two men nearly simultaneously but in different rooms. At first, Albis described going to the bars but omitted what happened afterward. He later described the entire series of events. The defendant first told police he could not remember things because he had been drinking. He admitted "bar hopping" with Albis, but denied getting into a fight with Champagne. When his interrogators learned of Albis's statement, they told the defendant they did not believe him. He then asked for a soft drink, a cigarette, and the opportunity to see his son. The officers acceded to his requests. The defendant disclosed that Champagne

had abused his cousin, who asked him to "beat his ass." He described the fight with Champagne after Champagne drove him and Albis home. Champagne never hit him and he punched Champagne an undetermined number of times. He remembered taking out his knife, but said he had no recollection of stabbing Champagne. He told them where he had put the knife and signed a consent form allowing police to search his apartment. The defendant said he did not intend to kill Champagne. One officer overheard him tell his son that he was never coming home because he had done a terrible thing — he had hurt and killed a man.

A variety of forensic tests and comparisons produced the following results. Deoxyribonucleic acid (DNA) testing of the blood on the boots worn by the defendant matched Champagne's DNA. The defendant's fingerprints were found on both rear doors of Champagne's car. Boot prints at the scene matched the boots worn by the defendant. No blood was found on the knife but blood is water soluble and can be washed away.

The defendant offered testimony of Dr. Paul Spiers, a licensed clinical and neuropsychologist with special expertise on the effects of alcohol on the brain. He opined that, based on his review of the defendant's medical records and the witness statements, and based on the combined effects of the Artane[4] and the alcohol the defendant consumed that evening, he was not able specifically to intend his actions or the results of his actions at the time he struck Champagne.

2. *Intoxication instruction.* The defendant argues that the judge's instruction on intoxication was deficient in numerous respects. He asserts the judge declined, over objection, to give the supplemental instruction on intoxication as it appears in the Model Jury Instructions on Homicide 61-63 (1999), that she failed to give any intoxication instruction as to the third prong of malice or to the so-called *Cunneen* factors to be considered on the question of extreme atrocity or cruelty, and that she failed to instruct the jury that they could consider the defendant's inges-

---

[4]Dr. Spiers testified that Artane is an antispasmodic medication used as a muscle relaxant for people with Tourette's Syndrome. It has properties similar to antihistamines. When taken with alcohol it produces a sense of euphoria and sometimes creates behavioral disturbances.

tion of drugs. *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

The trial transcript indicates that trial counsel, who is not appellate counsel, submitted to the judge written requests for jury instructions. However, those requests for instructions are not in the record. They were not filed with the clerk of the court and docketed, and they were not discussed with sufficient detail at the charge conference to assist us in determining what was requested specifically as to intoxication. In particular, there is no reference in the transcript to the Model Jury Instructions on Homicide, *supra*. Similarly, when trial counsel objected to the judge's instruction on intoxication, it was unspecific. We conclude that the defendant has failed to preserve properly the question of the judge's failure to follow the model instructions. We review to determine if any error resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Jewett*, 442 Mass. 356, 370 (2004).

Although it is recommended that a judge give the model instruction on intoxication, failure to give it is not error. "All that we have ever required be said to juries about the effect of drug [including alcohol] consumption on a defendant's intent or knowledge would be satisfied by a simple instruction that the jury may consider credible evidence of the effects of the defendant's consumption of drugs [or alcohol, or both] in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt." *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992). See *Commonwealth* v. *Burgess*, 434 Mass. 307, 316 (2001). See also Model Jury Instructions on Homicide, *supra* at 1.

The judge's instructions on deliberately premeditated murder began with a definition of deliberate premeditation followed by a definition of malice. Both were correct. She then instructed: "In considering intent, in considering premeditation . . . you may take into consideration ingestion of alcohol by the defendant in determining whether or not he had the ability to premeditate, he had the ability to have a specific intent, a specific purpose to kill." This instruction was adequate. The jury's attention was separately directed at the elements of this theory of murder that might be affected by intoxication. They

were told they could consider evidence of alcohol consumption appropriately on the question of premeditation, see *Commonwealth* v. *Giguere*, 420 Mass. 226, 232 (1995), and malice (specific intent), see *Commonwealth* v. *Sires, supra* at 298-300.

The judge's instruction on the elements of murder committed with extreme atrocity or cruelty began with an explanation of the three prongs of malice, followed by a definition of extreme atrocity or cruelty and a discussion of the *Cunneen* factors. See *Commonwealth* v. *Cunneen, supra.* Her correct instructions were followed immediately by an instruction that when "determining whether or not the defendant had the necessary state of mind, the malice, as I have defined it, for first degree murder, extreme atrocity or cruelty, you may turn to all of the circumstances as you find them to be in determining such state of mind, including alcohol ingestion and whether or not that affected the defendant's state of mind." This instruction focused the jury's attention on the elements of malice applicable to this theory of murder. Significantly, her use of the term "state of mind" is broader than the term "specific intent," which she used in the intoxication instruction given with the theory of deliberate premeditation. "State of mind" is the same term this court used in *Commonwealth* v. *Sires, supra* at 300, to describe collectively the Commonwealth's burden in cases involving proof of a defendant's "intent or knowledge." We are satisfied that the judge's instruction adequately informed the jury they could consider evidence of alcohol consumption on the element of malice applicable to the theory of extreme atrocity or cruelty, including the knowledge component of the third prong of malice. See *Commonwealth* v. *Sama*, 411 Mass. 293, 298-299 (1991).[5]

The defendant correctly points out that the intoxication instruction given with the theory of extreme atrocity or cruelty fails to tell the jury they could consider evidence of alcohol consumption among the circumstances when determining whether the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Perry*, 385 Mass. 639, 648-649

---

[5]This same analysis is dispositive of the similar intoxication instruction the judge gave in conjunction with the definition of malice applicable to the crime of murder in the second degree.

(1982). See also *Commonwealth* v. *Doucette*, 391 Mass. 443, 455 (1984) (where evidence suggests defendant was so far overcome by intoxicating substances as to be incapable of deliberate premeditation or of committing murder with extreme atrocity or cruelty, he is entitled, as matter of common and not constitutional law, on request, to instruction that jury may consider such evidence when deciding whether Commonwealth had met its burden as to deliberate premeditation or extreme atrocity or cruelty). Because the defendant did not specifically object on this basis, see *Commonwealth* v. *Chapman*, 433 Mass. 481, 489 (2001), we review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Berry*, 420 Mass. 95, 113 (1995).

The evidence of extreme atrocity or cruelty was overwhelming. The attack was disproportionate to what was needed to bring about death. The defendant first attacked Champagne by stabbing him several times in the back. He continued stabbing Champagne, who never landed one blow, until Albis intervened. Champagne suffered twenty-two stab wounds, most of which were delivered to the torso with considerable force and a high likelihood of serious injury or death.[6] Champagne was conscious during much of the attack, as he had three defensive wounds on his arms, which would have occurred after the wounds to his back. The defendant appeared to take pleasure in the killing. Minutes after the stabbing he boasted that he had just killed someone by stabbing him fifteen times, and he displayed the knife he used. Most, if not all, the *Cunneen* factors are present here.

The evidence of intoxication was not strong. Although a significant amount of drugs and alcohol were consumed (two pills and approximately ten drinks over seven hours), the defendant was not debilitated by it. *Commonwealth* v. *DelValle*, 443 Mass. 782, 793-794 (2005). He took the knife out of his pocket, opened it (it is a folding knife) by pressing a "button" that required considerable pressure, and kept it concealed even from Albis, who told the defendant he did not want any problems, until the last minute. He stabbed Champagne with

---

[6]The wound to the shoulder was "a through and through injury," penetrating Champagne's leather jacket, and leaving a "hilt mark" in his skin.

some precision and considerable force. He knew he had killed someone, and he was well aware of the details of the killing. He had the presence of mind to count fifteen of his twenty-two thrusts. He intimidated people with details of what he had done to gain their silence.

Where the jury rejected the claim that, based on evidence of the defendant's consumption of alcohol, the Commonwealth had failed to prove he acted with malice as to this theory of murder or that he acted with deliberate premeditation, it is highly unlikely that they would have found that the defendant did not commit the murder with extreme atrocity or cruelty based on the same evidence of his consumption of alcohol.

We turn to the defendant's final assertion of error as to the intoxication instruction, namely, that the judge made no mention that the jury could consider the defendant's consumption of drugs in conjunction with alcohol. There was no specific objection, *Commonwealth* v. *Chapman, supra,* so we consider whether any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Berry, supra.*

There was no dispute that the defendant had taken two Artane pills between 6:30 P.M. and 7 P.M. on March 4, 2000, about one hour before he and Albis went out. He had not consumed any alcohol thus far that evening. By the time they had arrived at the first bar it appeared to the bartender that the defendant had been drinking. Dr. Spiers testified about the synergistic effects of Artane and alcohol. There was no serious dispute about the amount of alcohol consumed. There was no attempt to ascertain the effect of alcohol on the defendant apart from the effect of Artane. In the circumstances, it is highly unlikely that the jury did anything but consider the defendant's state of sobriety based on the combined effects of Artane and alcohol. Indeed, that was probably the only workable way to consider the evidence. We conclude that the failure to instruct the jury that they could consider the effects of both drugs and alcohol would have made no difference in the outcome of the trial.

3. *Motion for a new trial.* The defendant appeals from the denial of his motion for a new trial, which is based primarily on a claim that trial counsel rendered ineffective assistance by failing to present evidence that the defendant was incapable of the

requisite mental state needed to establish deliberate premeditation or malice by virtue of the combined effects of his level of intoxication and Tourette's Syndrome.

The first aspect of the claim is that trial counsel failed to investigate a "diminished capacity" defense based on mental disease or defect and the defendant's medical history. He in fact did so, and the motion judge, who was also the trial judge, so found. Dr. Spiers's affidavit, filed with the defendant's motion for a new trial, indicates he had been engaged by trial counsel precisely for this purpose. Trial counsel provided Dr. Spiers with the defendant's medical records, police reports, and witness statements, and he consulted with trial counsel about testifying that the "alcohol [the defendant consumed] had an enhanced disinhibitory effect on [his] nervous system because he suffers from Tourette's Syndrome, [which] would have resulted in a diminished capacity to think rationally and control his behavior." He also was prepared to offer a series of opinions that the defendant "[lacked] the capacity to premeditate . . . could not formulate a specific intent to kill . . . was not capable of formulating the intent to cause grievous injury or of understanding from the circumstances that his actions presented the substantial likelihood of causing Mr. Champagne's death," and that he lacked the capacity to commit murder with extreme atrocity or cruelty. Trial counsel reviewed the medical records and also spoke with Dr. Jay Ellis, the defendant's treating neurologist for seventeen years.

Trial counsel indicated in his affidavit that he had concerns about the viability of building a defense around Tourette's Syndrome, based in part on his own observations of the absence of any serious problems manifested by the defendant's behavior and appearance, and based in part on evidence that, shortly after the killing, the defendant told witnesses that he would get away with the killing because he had Tourette's Syndrome. To trial counsel this "smacked of a specific intent . . . to . . . kill."

Notwithstanding his concerns, and mindful that the strength of the Commonwealth's case meant there was little hope for an acquittal, trial counsel determined that the best defense was to develop evidence that would result in a manslaughter instruction. He notified the district attorney of his intent to pursue a defense

based on Tourette's Syndrome combined with the evidence of substantial consumption of alcohol. See Mass. R. Crim. P. 14 (b) (2), 378 Mass. 874 (1979); *Commonwealth* v. *Diaz*, 431 Mass. 822, 828-829 (2000). He furnished the report of Dr. Spiers and the defendant's medical records to the district attorney. The district attorney interviewed Dr. Ellis, whose reports were included. He expressed the opinion that Tourette's Syndrome played no part in the killing. The district attorney notified trial counsel that if he proceeded with a defense based on Tourette's Syndrome, he intended to call Dr. Ellis, the defendant's treating neurologist, in rebuttal. As a result, trial counsel decided to forgo a defense based on Tourette's Syndrome and to proceed with intoxication as the focal point of the defense. Dr. Spiers gave essentially the same ultimate opinion, tied to the defendant's alcohol consumption, that he was prepared to give using Tourette's Syndrome as the basis.

The judge found that the "highly skilled" trial counsel's decision was not manifestly unreasonable.[7] She noted that "[i]f [trial counsel] had used the defendant's neurological disorder as a means of getting a manslaughter instruction, he would have emphasized the defendant's statements in the process of doing so. Instead, [he] chose to emphasize the defendant's alcohol consumption" to obtain a manslaughter instruction. Where the motion judge was also the trial judge, she could rely on her familiarity with the facts of the case, as she did here, and her conclusion is entitled to "special deference." *Commonwealth* v. *Nieves*, 429 Mass. 763, 771 (1999). We agree that his strategy was not manifestly unreasonable. As such, it cannot constitute ineffective assistance of counsel. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

The defendant also faults trial counsel for failing to follow up on Dr. Spiers's suggestion to consult a physician specializing in neurology and have the defendant tested for organic brain deficits. Subsequent testing for temporal lobe epilepsy was negative. The defendant has failed to show that "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

---

[7]The judge also noted during a sidebar conference at trial that trial counsel's decision was reasonable.

There is no merit to the claim that trial counsel "made a series of unfulfilled promises about evidence concerning [the defendant's] limited education, his dysfunctional family and deprived childhood, his long history of alcoholism, his inability to maintain employment, his history of Tourette's Syndrome, and his record of treatment for the condition." Dr. Spiers testified about the fact that the defendant had Tourette's Syndrome and he described the manifestations of the condition. He also testified that, based on his review of witness statements and the statement given by the defendant to the police, the defendant was manifesting the effects of the alcohol he consumed as well as the symptoms of his Tourette's Syndrome immediately after the stabbing. Other witnesses also testified that the defendant had Tourette's Syndrome. The reference in counsel's opening statement to Tourette's Syndrome materialized sufficiently during the trial. The details in trial counsel's opening statement that did not materialize in the evidence either became evident from the general tenor of the case, or were so inconsequential that, we can say with utmost confidence, they made no difference.

The crux of the defense began with Dr. Spiers's testimony about the defendant's Tourette's Syndrome. It provided foundation for the defendant's possession and use of Artane, and the combined effects of Artane and alcohol on him. Dr. Spiers's opinion testimony permitted a voluntary intoxication instruction, which in turn afforded the best opportunity for a manslaughter verdict. Without that testimony, it was not at all clear that the defendant was entitled to a voluntary intoxication instruction where there was no evidence of debilitating intoxication. See *Commonwealth* v. *DelValle*, 443 Mass. 782, 793-794 (2005). Contrary to the defendant's assertions, the defense was well integrated from trial counsel's opening statement to his closing argument.

The defendant's claim that counsel had not settled on his theory of defense until the last day of trial is belied by the record. Trial counsel avoided any emphasis of Tourette's Syndrome except as noted. The place in the record on which the defendant relies involves a sidebar conference requested by the district attorney to remove any doubt in his own mind that the defense was not

proceeding with a so-called "diminished capacity" defense based on Tourette's Syndrome. Trial counsel assured the judge and the prosecutor that that was not the case.

Finally, the judge did not abuse her discretion by deciding the claim of ineffective assistance in the motion for a new trial without conducting an evidentiary hearing. See *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992). The defendant's motion and affidavits did not raise a substantial issue by "cast[ing] doubt on" the issue of trial counsel's performance. *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001). The judge's conclusion that the defendant's motion and affidavits did not raise a substantial issue is entitled to substantial deference where she was also the trial judge. See *Commonwealth* v. *DeVincent*, 421 Mass. 64, 69 (1995). The judge could properly disregard, without conducting a hearing, the self-serving assertions in the defendant's affidavits that trial counsel did not discuss trial strategy with him. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003).

The defendant also raised in his motion for a new trial the issue of the judge's failure to give an instruction, conformably with *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), which requires a cautionary instruction as to witness credibility when cooperation agreements are predicated on a duty to offer truthful testimony. There was no objection at trial to the omission. There was no substantial likelihood of a miscarriage of justice because the case against the defendant was, as the judge noted, overwhelming. The testimony of Albis, the cooperating witness, was corroborated by other witnesses. The defendant's statement to police also largely corroborated Albis's testimony, and the defendant told police where he had hidden the knife. The judge did not abuse her discretion in denying the motion for a new trial. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

4. *G. L. c. 278, § 33E.* We have reviewed the transcripts, the briefs, and the entire record, and conclude that there is no basis on which to reduce the degree of guilt or order a new trial.

*Judgment affirmed.*

*Order denying motion for a new
trial affirmed.*