## COMMONWEALTH *vs.* ROBIN E. CASALI.

Barnstable. January 7, 2011. - March 17, 2011.

Present: IRELAND, C.J., SPINA, COWIN, CORDY, & GANTS, JJ.

*Homicide. Evidence,* Redirect examination, Cross-examination. *Witness,* Impeachment, Redirect examination, Cross-examination. *Practice, Criminal,* Instructions to jury, Capital case. *Constitutional Law,* Confrontation of witnesses. *Error, Harmless.*

At a murder trial, the judge did not abuse his discretion in limiting the scope of redirect testimony of a defense witness, where the profferred evidence was not rehabilitative of the witness's previous testimony. [143-145]

At a criminal trial, there was no error in the admission in evidence of a witness's testimony that an allegation of sexual abuse that had been made against the victim's husband was unfounded, where, although the prosecutor's question might have been objectionable in its form, the witness testified as to a matter of which he had personal knowledge. [145-146]

At a murder trial, there was no error in the judge's instruction to the jury regarding intoxication. [146]

At a murder trial, the erroneous admission in evidence of certificates of drug analysis unaccompanied by testimony from the analyst who performed the chemical analysis, in violation of the defendant's rights under the Sixth Amendment to the United States Constitution to confront the witnesses against her, was harmless beyond a reasonable doubt, where the powdery substance found in the defendant's bedroom was field tested by a police detective and determined to be heroin; where the defendant testified that the substances found in her bedroom were heroin and marijuana, that at the time of the murder she was a heroin addict and used marijuana, and that she had ingested heroin the night before the murder; where there was evidence the defendant was admitted for symptoms of heroin withdrawal the day after the murder; and where defense counsel conceded in closing argument that the defendant was guilty of possessing the heroin and marijuana, and was a heroin addict. [146-147]

INDICTMENTS found and returned in the Superior Court Department on December 15, 2006, and February 16, 2007.

The cases were tried before *Richard F. Connon,* J.

*Carlo A. Obligato,* Committee for Public Counsel Services, for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

CORDY, J. On the morning of June 5, 2006, seventy-three year old Winifred Moniz (Winifred) was stabbed to death in her kitchen. A jury found the defendant, Robin E. Casali, Winifred's grandniece, guilty of murder in the first degree.[1] On appeal, the defendant contends that (1) she was denied the right to rehabilitate a witness she had called in her defense after the witness had been impeached; (2) the judge erred in allowing a lay witness to testify that the allegation that the victim's husband had sexually molested his stepdaughter three decades prior to the murder was "unfounded"; and (3) the judge erred in failing to use the model jury instructions when instructing the jury on intoxication. We affirm the convictions and decline to grant relief under G. L. c. 278, § 33E.

1. *The trial.* a. *The Commonwealth's case.* The Commonwealth's theory of the case was that on the morning of the murder the defendant disguised herself, lay in wait, and entered the victim's home when she knew the victim's husband was not present for the purpose of stealing cash she believed was either hidden in the house or on the victim's person. A violent confrontation between the victim and the defendant ensued, during which the victim was killed. The motive for the theft was the defendant's need of money to support her heroin addiction.

In support of its theory, the Commonwealth presented evidence from lay witnesses, State and Falmouth police officers, crime scene analysts, and forensic experts, from which the jury could have found the following facts. The defendant lived in a home with her grandmother and her twenty-one year old daughter (Nicole) that abutted the victim's property. The victim's property, where she lived with her husband, Wayne Moniz (Wayne), consisted of several acres of land, including a large field which was regularly mowed. On June 5, 2006, the defendant left her home at approximately 8:10 A.M., claiming that she had to go to work and would return later in the morning to take her grandmother to a medical clinic. Rather than going to work, the

---

[1]The defendant was convicted of murder in the first degree on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. G. L. c. 265, § 1. She was also convicted of armed assault with intent to rob or murder a person over the age of sixty years, G. L. c. 265, § 18 (*a*); armed robbery, G. L. c. 265, § 17; illegal possession of heroin, G. L. c. 94C, § 34; and illegal possession of marijuana, G. L. c. 94C, § 34.

defendant drove her vehicle along a pathway into a cranberry bog, adjacent to the far boundary of the victim's property. There, parked partially hidden from view, she changed her clothes, put on a hooded sweatshirt and a bandana-type mask, and waited until Wayne began mowing the field, a chore which ordinarily took several hours. She then entered the victim's home where she remained until shortly after 9 A.M.; stabbed the victim more than one dozen times with a buck knife, killing her; and took her wallet.

While the defendant was in the victim's home, a neighbor telephoned the Falmouth police to report a suspicious vehicle (the defendant's automobile) that had been parked along the cranberry bog for nearly one hour. The call was recorded at 9:04 A.M. At 9:09 A.M., the neighbor again contacted the police to report having seen a person in a dark shirt[2] run through the wooded area between the victim's property and the bog and speed away in the vehicle.[3] Shortly thereafter, the defendant's vehicle was observed near a forested nature preserve, where she entered the woods and remained for several minutes.[4] Later that day, the police were alerted to this area when the victim's wallet[5] was found there by a local resident. There was no money in the wallet. With the assistance of a trained police dog, the police subsequently located a CVS Pharmacy bag hidden in the underbrush containing clothes (including a bandana, a hooded

---

[2]The neighbor later described the person she had seen running as small framed with light, long hair (similar to the defendant) wearing beige pants and a dark shirt.

[3]In response to the 9:04 A.M. call, a police officer was dispatched to check out the vehicle. The prosecutor argued that this dispatch would have gone out over the police radio and had been heard by anyone near a police scanner tuned to that frequency. There was testimony at trial that police scanners were inside the victim's home and were operating that morning. The prosecutor argued that the jury could infer that the defendant's speedy exit from the victim's house just after 9:04 A.M. may have been prompted by her hearing the dispatch.

[4]After the defendant reemerged from the woods, she drove her vehicle to a local gasoline station where she purchased gasoline at 9:33 A.M. She then returned to her home, picked up her grandmother, and arrived at the medical clinic at 10 A.M.

[5]The resident also found a pair of black pants belonging to the defendant and her daughter. There was testimony that the defendant and her daughter wore each other's clothes on occasion.

sweatshirt, and gloves) belonging to the defendant. The clothes were stained with the victim's blood. A buck knife covered in the victim's blood also was found "hooked over" a branch of a nearby tree.

The police interviewed the defendant later that afternoon. She denied any involvement in or knowledge about the killing and fabricated a story and a time line about her movements that morning. During two searches of her home, the police seized the beige pants she was seen wearing in the morning,[6] as well as substances found in her bedroom, identified as marijuana and heroin.

The defendant was arrested on June 6, 2006, and was transported to a local hospital because of symptoms attributed to heroin withdrawal.

b. *The defense.* The defense in the case conceded that the defendant had disposed of the bloody evidence from the crime scene, but claimed that she was not present when the victim was killed, that the victim's husband (Wayne) committed the murder, and that she only disposed of the evidence because Wayne had threatened to do the same to her daughter if she did not. The defendant took the stand and testified to this effect, admitting that she had lied to the police, but explaining that she had lied out of fear of Wayne and the fear that she would be implicated in the crime.

The defense also produced evidence that in the week prior to the murder, Wayne had received a handwritten letter stating that one of his nephews, Douglas White (White), "says you sexually molested your daughter Pamela."[7] This, the defense alleged, angered Wayne greatly and led to a face-to-face meeting between White, the victim, and Wayne, as well as a telephone conversation between Wayne, the victim, and Pamela (the victim's daughter and Wayne's stepdaughter) about the allegations. Pamela lived in Ohio. The defense argued that Wayne may have killed the victim to keep this information from being spread more broadly.

---

[6]There were bloodstains on these pants as well. The victim was determined to be a potential contributor to the stains.

[7]Although the letter was written on Douglas White's business stationery, he testified that he did not author it or know who had.

Pamela was called as a witness at trial by the defendant and testified that she had been sexually abused by Wayne thirty years before, and had left home at the age of eighteen.[8] She also testified that during a telephone conversation with Wayne and her mother, Wayne said, "Are we okay then?"[9] and that when she returned to Massachusetts for her mother's funeral, Wayne instructed her not to make a scene because police were there. Finally, she testified that she had told her mother about the abuse at the time it was occurring but that her mother had done nothing about it.

The defense also called White, who testified that he learned about the handwritten letter in a telephone call from his sister-in-law, and subsequently met with Wayne and the victim to discuss it. At that meeting, Wayne appeared angry and said, "Somebody must really hate me," and that he wanted to find out who had written it. This meeting occurred about one week before the victim's murder, and, after the murder, White brought a copy of the letter to the police station.[10]

In further defense of the case, and throughout the examination of the Commonwealth's witnesses, defense counsel repeatedly questioned what the police had done to investigate Wayne's involvement in the murder and the information contained in the handwritten letter. Accordingly, in closing, defense counsel strongly argued that the investigation had been inadequate in this regard, in large measure due to the long-standing friendships between Wayne and members of the Falmouth police department.[11]

2. *Claims of error at trial.* The defendant raises three claims of error. We address each of these issues in turn.

a. *Testimony of Pamela.* As noted above, Pamela testified that Wayne sexually molested her and that her mother, Winifred, had been made aware of the abuse but had done nothing about it. In response to a pretrial motion by the Commonwealth to exclude

---

[8]Wayne denied these allegations during his testimony.

[9]Wayne also denied that this conversation had taken place.

[10]The police apparently did not investigate the letter further until shortly before trial.

[11]The judge included a so-called *Bowden* instruction in his charge to the jury. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980).

Pamela's testimony, the judge conducted a voir dire of Pamela. During the voir dire, she testified that Wayne sexually abused her and that the reason Winifred did not report the abuse was because "no one would believe [Winifred] or her." The judge denied the Commonwealth's motion to exclude her testimony, but before Pamela took the stand, he clarified that Pamela's testimony was to be limited to her alleged sexual abuse by Wayne. Defense counsel responded that he also intended to ask Pamela about Wayne's relationship with Winifred, and specifically to elicit testimony from Pamela that Wayne had physically abused Winifred when she lived with them. The judge denied the defendant's request to elicit such testimony, concluding that evidence to that effect, essentially offered to support the proposition that Wayne likely killed Winifred, was too remote in time, as Pamela had not lived with Winifred and Wayne for more than thirty years.

On cross-examination, the prosecutor asked Pamela if she had heard of the Web site, "Home Sweet Home." At a sidebar conference, the prosecutor told the judge that Pamela had posted a statement on the Web site that the victim "was a wonderful woman and mother." The prosecutor argued that this evidence was relevant to Pamela's credibility where she had just testified that she had been sexually abused and that Winifred knew about the abuse but had done nothing about it. Defense counsel then argued that if such testimony were allowed, the defense should be allowed to rehabilitate Pamela by eliciting testimony from her that Winifred did not report the abuse because she, Winifred, was being physically abused by Wayne. The judge allowed the prosecutor to elicit testimony about the Web site posting, but did not allow the defense to elicit testimony that Wayne had physically abused Winifred.

Redirect examination is meant to explain or rebut testimony elicited during cross-examination. *Commonwealth* v. *Marrero*, 427 Mass. 65, 69 (1998). "The scope of redirect examination of a witness is within the sound discretion of the trial judge. . . . A defendant who claims, on appeal, an abuse of discretion, assumes a heavy burden." (Citations omitted.) *Commonwealth* v. *Maltais*, 387 Mass. 79, 92 (1982). The defendant has failed to carry that burden. Pamela testified during the voir dire that the

reason Winifred did not report the sexual abuse was because no one would believe her, not because she was being physically abused by Wayne. Evidence that Wayne physically abused Winifred while Pamela lived at home with them was not rehabilitative of Pamela's previous testimony; it was an attempt to put evidence of Wayne's alleged physical abuse of Winifred before the jury, evidence that the judge had previously ruled was too remote. The judge did not abuse his discretion when he refused to allow it.

b. *Testimony of Douglas White.* The defendant argues that it was error to admit White's testimony that the sexual abuse allegation against Wayne (alluded to in the handwritten letter) was "unfounded." The defendant asserts that such testimony was an inadmissible opinion by a lay witness. The testimony was elicited by the prosecutor during his very brief cross-examination of the witness.[12] The prosecutor first asked whether the letter suggests that "you [White] said to someone that [Wayne] had molested his daughter, correct?" To which the witness replied, "That's correct." The prosecutor then asked, "[I]sn't it true that you indicated [to the police] there was an allegation that your uncle may have done something like that, but it was unfounded?"[13] White answered, "That is correct."

While the prosecutor's question may have been objectionable in its form, the substance of the testimony elicited from the witness was admissible. The testimony was meant to clarify for the jury that although the letter was on White's stationery, White had not told someone that Wayne had abused Pamela (as the letter suggested White had done), and that he had no basis to have made such an allegation. White was testifying based on his personal knowledge of the letter and the allegation contained therein. This situation is distinguishable from the one in *Commonwealth* v. *Martin*, 417 Mass. 187 (1994), relied on by

[12]The prosecutor asked only four questions on cross-examination.

[13]During direct examination, defense counsel had shown White a report of what he had told the police when he was interviewed (long after the victim's death) to refresh his memory as to what Wayne had said ("he wanted to find out who wrote it") in the victim's presence after receiving the letter. On cross-examination, the prosecutor was eliciting testimony that when speaking with the police, White had also told them that the allegation contained in the letter, based on his personal knowledge, was unfounded.

the defendant. In *Martin*, we granted the defendant a new trial because the judge allowed the defendant's girl friend to testify as to her "instincts" and "suspicions" about the conduct of the defendant. *Id.* at 189-191. Here, White was testifying as to a matter of which he had personal knowledge: the letter written on his stationery stating that he had made a certain allegation. There was no error.

c. *Jury instructions on intoxication.* During the charge conference, the judge stated that he intended to give an intoxication instruction to the jury because there was some evidence of the defendant's intoxication the day of the murder. Specifically, there was information in hospital records to the effect that the defendant was admitted to a hospital on the night of June 6, the day after the murder, for symptoms of heroin withdrawal, and there was evidence in the defendant's testimony that she ingested heroin the day before the murder.

Although the defendant did not request an intoxication instruction, or present intoxication as a defense to any of the elements of the crimes charged, the judge, out of an abundance of caution, proceeded to instruct the jury on the subject. His instruction to the jury was based on this court's suggested instruction in *Commonwealth* v. *Sires*, 413 Mass. 292, 300-301 (1992), which reads: "Whenever the Commonwealth must prove the defendant's intention to do something, you should consider all the credible evidence relevant to the defendant's intent, including any credible evidence of the effect on the defendant of (his) (her) consumption of (alcohol) (drugs) (alcohol and other drugs)."

The defendant argues that the judge erred when he did not give the model jury instruction on intoxication, which the defendant had requested after the judge indicated that he would instruct on intoxication. The defendant cites *Commonwealth* v. *Smith*, 449 Mass. 12, 17 (2007), in which we "recommended that a judge give the model instruction on intoxication." This was only a recommendation, not a mandate. The judge's instruction was adequate. There was no error.

3. *General Laws c. 278, § 33E.* We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised

on appeal. One issue gives us pause, but is ultimately without consequence.

During the Commonwealth's direct examination of State Trooper Patricia Beehan, it offered in evidence certificates of drug analysis (drug certificates) that identified the substances found in the defendant's bedroom as marijuana and heroin. The defendant objected to the admission of the drug certificates based on *Commonwealth* v. *Melendez-Diaz*, 69 Mass. App. Ct. 1114 (2007), cert. granted, 552 U.S. 1256 (2008), which was then pending in the United States Supreme Court. In *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2532 (2009), the Supreme Court held that drug certificates are out-of-court testimonial statements that trigger the protections of the confrontation clause of the Sixth Amendment to the United States Constitution and, without the testimony of the analyst who performed the chemical analysis, are inadmissible against a criminal defendant.

Because the defendant objected to the admission of the drug certificates at trial, we review the error to determine whether it was harmless beyond a reasonable doubt. *Commonwealth* v. *Vasquez*, 456 Mass. 350, 352 (2010), citing *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998). Here, the admission of the drug certificates was harmless beyond a reasonable doubt. The powdery substance found in the defendant's bedroom was field tested by Detective Lieutenant Robert Melia and determined to be heroin. See *Commonwealth* v. *Connolly*, 454 Mass. 808, 831 (2009). The defendant testified that the substances police found in her bedroom were in fact heroin and marijuana. The defendant testified that at the time of the murder, she was a heroin addict and used marijuana, and that she had ingested heroin the night before the murder. There was also evidence that the defendant was admitted for symptoms of heroin withdrawal the day after the murder. Finally, defense counsel conceded in her closing argument that the defendant was guilty of possessing the marijuana and the heroin, and was a heroin addict. We decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

*Judgments affirmed.*