# United States Court of Appeals
## For the First Circuit

No. 11-1216

VICTOR E. SMITH,

Petitioner, Appellant,

v.

THOMAS DICKHAUT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Selya and Stahl,

Circuit Judges.

Charles K. Stephenson for appellant.
Annette C. Benedetto, Assistant Attorney General, Criminal
Bureau, with whom Martha Coakley, Attorney General, was on brief
for appellee.

February 17, 2012

**BOUDIN**, <u>Circuit Judge</u>.   Victor Smith is serving a life sentence in a Massachusetts state prison for first-degree murder. Massachusetts' Supreme Judicial Court ("SJC") affirmed Smith's conviction on direct review, <u>Commonwealth</u> v. <u>Smith</u>, 864 N.E.2d 1194 (Mass. 2007), and he now appeals from the federal district court's denial of habeas relief.   The facts underlying the conviction are set out at length in the SJC's opinion, and need only be summarized here.

Smith and a friend, Francis Albis, spent the evening of March 4, 2000, "bar hopping" in North Adams, Massachusetts.   They each consumed about ten drinks over the course of six hours or so, and witnesses reported that they showed signs of drinking but did not seem drunk.   Early in the evening, Smith also consumed two Artane pills, a medication prescribed to him for treating Tourette's Syndrome ("Tourette's"), which Smith had been diagnosed with at a young age.   <u>Smith</u>, 864 N.E.2d at 1196, 1202.[1]

When Smith and Albis were at their final bar of the night, they saw David Champagne, who was dating Smith's cousin. Smith, upset over a report that Champagne had beaten her up, told Albis that he wanted to "kick [Champagne's] ass," and announced to

---

[1]Tourette's is a developmental disorder "that affects the involuntary movements controlled by the frontal networks of the brain." <u>Smith</u>, 864 N.E.2d at 1196.  Although popularly associated with inappropriate speech, the much more common symptoms are involuntary physical tics such as blinking and facial movements. <u>See</u> Am. Psychiatric Assoc., <u>DSM-IV-TR</u> 111-14 (4th ed. 2000).

other bar patrons that he wanted revenge. Smith, 864 N.E.2d at 1196-97. Unaware of the threats, Champagne later provided Smith and Albis a ride home. During the trip, Smith accused Champagne of beating up his cousin, and they argued until Champagne parked his car near the apartment buildings where Smith and Albis lived. Shortly thereafter, Smith attacked Champagne, fatally stabbing him twenty-two times in the back, chest, shoulder, neck and face. Id. at 1197-98.

Leaving Champagne to bleed to death, Smith and Albis walked into their apartment complex, where they encountered three tenants. Smith pushed one of them up against a wall and bragged that he "just did a guy" and was not afraid "to do another one." Smith, 864 N.E.2d at 1197. Smith told Albis and the tenants that he would "get away with it" because he had Tourette's Syndrome, a statement that Smith later repeated at Albis' apartment; he threatened Albis' wife Melissa when she attempted to call the police, stating that he would have no problem killing her or her five children. Id.

The police discovered Champagne's body a few hours later, and their investigation quickly led to Smith and Albis. Smith admitted to fighting Champagne but claimed no recollection of stabbing him, though an officer later overheard Smith tell his son that he was never coming home because he had done a very bad thing: hurt and killed a man. Smith, 864 N.E.2d at 1198. A search of

-3-

Smith's apartment led to a knife that--although it had no blood on it because Smith had washed it--was consistent in size and shape with Champagne's wounds.  Id.

The state charged Smith with first-degree murder, alleging deliberate premeditation and extreme atrocity or cruelty. Testimony from Albis about the killing, along with forensic evidence and testimony from others who had heard Smith's threats and boasts, established a powerful prima facie case of first-degree murder, leaving Smith with the need to establish a defense or negate some element of the murder offense to bar or reduce the charge.

Smith's lead counsel relied centrally on an intoxication defense designed to achieve a manslaughter verdict.[2]  An expert defense witness, Dr. Spiers, testified about the effects of alcohol on the brain and the combined effects of alcohol and Artane--in particular, resulting behavioral disturbances--and opined that the combined effects of the alcohol and Artane rendered Smith unable to intend his actions or the results of his actions at the time that he stabbed Champagne.  Smith, 864 N.E.2d at 1198 & n.4.

---

[2]Under Massachusetts law, "[v]oluntary intoxication may preclude the defendant from forming the malice aforethought necessary to commit murder." Commonwealth v. Murphy, 813 N.E.2d 820, 836 (Mass. 2004).  While "killing without malice does not automatically become involuntary manslaughter," an involuntary manslaughter instruction is "required" when the "traditional elements of involuntary manslaughter [are] shown by evidence that the jury might believe." Commonwealth v. Sires, 596 N.E.2d 1018, 1025 (Mass. 1992).

-4-

The judge instructed the jury that it could consider whether intoxication affected Smith's state of mind so as to negate elements of the murder charge, and also instructed the jury on the lesser crime of involuntary manslaughter as an alternative to murder. Smith, 864 N.E.2d at 1199-200, 1202. The jury convicted Smith of first-degree murder, finding both deliberate premeditation and extreme atrocity or cruelty. By a new trial motion, Smith pressed a challenge to the competence of trial counsel but the motion was denied.

The gist of Smith's ineffectiveness claim was that his trial counsel was ineffective in failing to investigate and present a defense that Smith's Tourette's Syndrome exacerbated the effects of the alcohol and Artane, and also that he was legally insane at the time of the killing on account of the Tourette's Syndrome and other mental illness. The SJC reviewed the claim, along with other challenges to the conviction not pursued on appeal. Finding that counsel had not been incompetent, it affirmed. Smith, 864 N.E.2d at 1203.

Smith sought habeas corpus in the district court, 28 U.S.C. § 2254 (2006), which denied relief but granted a certificate of appealability on the issue of whether Smith's trial counsel had rendered ineffective assistance. Because the state court found that counsel had offered a competent defense, our review on habeas is limited as to both fact and law by the familiar standards

-5-

requiring deference, but our result here would be the same even if no deference were accorded.[3]

This is not a case in which defense counsel had many good choices nor one where, even assuming errors in the defense, it would be easy to show the kind of prejudice required. See Strickland v. Washington, 466 U.S. 668, 692-96 (1984). Smith had a professed motive for murder, made threats in advance, savagely stabbed the victim without immediate provocation, boasted to others of the killing, and seemingly threatened to kill Melissa Albis, her five children or all of them when she sought to call the police.

Nevertheless, the question remains why Smith's lead counsel did not try to make use of Tourette's in some fashion; and Smith suggests two ways: to augment the drinks and pills argument of diminished capacity, e.g., Commonwealth v. LaCava, 783 N.E.2d 812, 820-21 (Mass. 2003); see also note 2, above, or to bolster an insanity claim that would create a full defense where, "due to a mental illness (mental disease or defect), [a defendant] lack[ed] the substantial capacity to appreciate the wrongfulness of an action or to act in conformity with the law" at the relevant time. Commonwealth v. DiPadova, 951 N.E.2d 891, 897 (Mass. 2011).

---

[3]In such cases, habeas relief is limited to instances where a state court adjudication resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

-6-

In fact, trial counsel had investigated with Dr. Spiers the possibility of using Tourette's to augment the diminished capacity argument, and Dr. Spiers was prepared to offer some helpful testimony that Tourette's would enhance the effects of the alcohol and medication, so the matter was investigated. But, counsel explained in an affidavit responding to the new trial motion

> -that after counsel investigated and notified the government he would offer a defense based partially on Smith's Tourette's Syndrome, the government represented that it was prepared to offer expert rebuttal testimony from Smith's treating neurologist of seventeen years, Dr. Ellis, who would testify that Smith's Tourette's Syndrome played no part in the killing;
>
> -that counsel's "own observations of [Smith revealed the] absence of any serious problems manifested by [Smith]'s behavior and appearance"; and
>
> -that counsel was concerned the government could effectively argue that Smith's several "get away with it" statements showed that a Tourette's-based defense was part of a plan to kill Champagne and avoid criminal responsibility--suggesting premeditation and specific intent.

Smith, 864 N.E.2d at 1202.

Smith's statements were going to come into evidence in any event, but emphasizing Tourette's, coupled with rebuttal from Smith's own long-time doctor (Dr. Ellis), could easily have tainted a drug and alcohol diminished capacity defense supported only by the opinion of a doctor less familiar with Smith. That Dr. Ellis

-7-

was prepared to testify as represented was confirmed by his own post-trial affidavit. Counsel's decision was in all events a reasonable strategic judgment entitled to deference in a Strickland inquiry. Robidoux v. O'Brien, 643 F.3d 334, 338 (1st Cir.), cert. denied, 132 S. Ct. 866 (2011).

Smith also argues that his counsel should have offered an insanity defense premised on Tourette's Syndrome and other evidence of mental illness. A new trial motion affidavit by Dr. Boshes, engaged by Smith's appellate counsel, opines that Smith "may suffer from Temporal Lobe Epilepsy," and that in Dr. Boshes' medical opinion, Smith had a seizure at the time of the killing that rendered him legally insane. A post-trial scan authorized by the state trial court came back negative. Smith, 864 N.E.2d at 1203.

Dr. Boshes asserts that a negative scan is far from conclusive, but there is nothing to suggest that--in reviewing Smith's medical records and consulting two separate medical experts about Smith's mental health history--counsel overlooked a fruitful possibility. Absent hard scientific support, a jury would not likely accept a sudden seizure as the explanation given Smith's motive, prior threat and subsequent boasts and threats. And the SJC's factual findings regarding Smith's counsel's investigation and strategic decisions were reasonable in light of the evidence presented. Smith, 864 N.E.2d at 1203.

-8-

Smith makes a scattering of other claims of error--in particular, an alleged lack of consultation by counsel with Smith and other members of the defense team, a claim that Massachusetts law did not support counsel's strategy, and the failure of the state court to hold an evidentiary hearing on the new trial motion. The SJC deals sufficiently with the points--most of which are inadequately developed on appeal--and nothing independent of the Tourette's issues is even within the certificate of appealability.

Affirmed.