## COMMONWEALTH *vs.* ABDER R. B. SALIM.

Essex.   October 7, 1986. — February 17, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & NOLAN, JJ.

*Homicide. Evidence,* Previous testimony of unavailable witness, Cross-examination, Prior misconduct. *Witness,* Unavailability. *Constitutional Law,* Confrontation of witnesses. *Interpreter. Attorney at Law,* Compensation, Contingent fee agreement.

At the trial of a defendant charged with the murder of his wife, the mosaic of physical and circumstantial evidence, including evidence that the defendant obtained, shortly before the crime, tools capable of inflicting wounds of a character consistent with the multiple puncture wounds which caused the victim's death; testimony as to the defendant's movements on the day of the murder, which permitted inference that he had lied to police; and descriptions of the defendant's physical abuse of the victim shortly before the murder, his threats to kill her, and repeated offers of money to others to kill her, warranted the jury's verdict of guilty of murder in the first degree. [228-233]

At the trial of a murder case, the defendant's constitutional rights of confrontation were not infringed by the judge's admitting the recorded testimony of two witnesses, each of whom had testified that the defendant had offered him money to kill the victim, where the judge was warranted in concluding that the two witnesses were unavailable and that the Commonwealth had made a good faith effort to locate them, and where the record established that the defendant had had an adequate opportunity to cross-examine the witnesses when they gave their recorded testimony. [233-235]

At the retrial of a murder case during which the defendant presented eleven new witnesses who testified as to the defendant's activities on the day of the crime, no substantial risk of a miscarriage of justice was presented by the circumstance that the prosecutor, during cross-examination which focused chiefly on the unreliability of these witnesses' memory after a lapse of nearly three years from the events at issue, elicited from some of them the fact that they had not testified at the defendant's original trial. [235-236]

At the trial of a defendant charged with the murder of his wife, the admission of testimony tending to show the defendant's bad character resulted in no reversible error. [236-238]

At a criminal trial the judge acted within his discretion in appointing an interpreter for a witness and in determining that the interpreter was qualified and impartial. [238]

No impermissible contingent fee arrangement or any conflict of interest was created where a judge, in appointing counsel for a defendant charged with the murder of his wife, indicated that, if the defendant received the proceeds of a policy of insurance on the victim's life, which would probably occur only in the event of his acquittal, counsel fees should be paid from the insurance proceeds rather than from public funds. [238-239]

INDICTMENT found and returned in the Superior Court Department on September 15, 1978.

The case was tried before *Eileen P. Griffin*, J.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

*Robert J. Bender*, Assistant District Attorney (*Robert P. Ziemian*, Assistant District Attorney, with him) for the Commonwealth.

NOLAN, J. The defendant appeals from a conviction of the murder in the first degree of his wife.[1] The issues the defendant raises concern the denial of his motion for a required finding of not guilty, the correctness of certain evidentiary rulings, the appointment of an interpreter for a witness, and an alleged contingent fee arrangement with his trial counsel, who is not appellate counsel. He also seeks review under G. L. c. 278, § 33E (1984 ed.). We affirm.

1. *Motion for Required Finding of Not Guilty.*

The standard by which we measure the correctness of the judge's denial of a motion for required finding (Mass. R. Crim. P. 25, as amended, 389 Mass. 1107 [1983]) is whether, considering all the circumstances, including appropriate inferences, in the light most favorable to the Commonwealth (*Commonwealth* v. *Dunphy*, 377 Mass. 453, 455-456 [1979]), a jury of ordinary intelligence would be satisfied of guilt beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676 (1979), and cases cited.

---

[1] The defendant's first trial ended in a mistrial on February 12, 1980. He was convicted on June 1, 1981, after his second trial.

At the close of the Commonwealth's case-in-chief, there was evidence warranting the jury in finding the following facts.[2] Certain emergency medical technicians were dispatched to the defendant's home in Lawrence at about 5:10 P.M. on July 28, 1978. They found the defendant crying and kneeling over his wife's body. Her face appeared to have been beaten and there was heavy concentration of coagulated blood on her chest as well as her face. She lay on her back and displayed no signs of life. When the police arrived, they observed multiple puncture wounds about the neck and chest.

After a State police detective extended his sympathy to the defendant, he read him the Miranda rights. The defendant, a native of Palestine, had emigrated from Jordan to Lawrence. The defendant later visited Jordan and returned to Lawrence with the victim as his wife. He became reasonably fluent in Spanish as well as in English and was well known in the Spanish-speaking community of the Merrimack Valley. He operated a store which sold furniture and household goods.

The defendant told the detective that he had awakened at 8 A.M. but remained in bed until after his wife left with the children at 8:30 A.M. He drove to the store at 9 A.M. where he met his brother-in-law, Amin Rabah Hamdi. They went to a local bank, returned to the store, and opened for business at about 10 A.M. About noon his bookkeeper arrived and remained until about 2:30 P.M. The defendant told the detective that his brother-in-law had left earlier, returned to the store about 3:30 P.M., left again about 5 P.M., and returned about 5:15 P.M. He received a telephone call from his children's day care center at about 5 P.M., informing him that his wife had not picked up the children. After picking up the children, he returned home with them and discovered his wife's body.

The defendant said that he had worn the same clothing all day and had not returned to his house since leaving at 9 A.M. He said that he had had no marital problems, that he was

---

[2] The Commonwealth's position as to proof did not deteriorate between the time that the Commonwealth rested and the close of all the evidence. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976).

happily married, and that his wife's death was caused by people in Lawrence "who were out to get him." At this juncture in the story, he pointed to an open window and said that "[t]hese people came in the window and went out the door" which was ajar when he came home.

The detective asked the defendant about the scratches on his face, neck, and collar bone and the defendant explained that he had caused those marks by pulling at his face in lamentation when he discovered the body of his wife. The defendant went to the Lawrence police station where he spoke with other officers and repeated the story of his day's activities substantially as he had related it to the detective at the scene. The detective observed that the house showed little disarray although the victim's pocket book had been opened and the contents dumped on the table. There was no evidence of forced entry or any attempt to remove property.

At the station, he submitted to a series of tests, which revealed the presence of blood on the defendant's left palm, the back of his left hand, the underside of the fingers on his left hand, his left fingertips, as well as on his right palm and the underside of the fingers of that hand. The next day, the defendant again told the detective that there were people who were causing him trouble and that the detective should find out "who they are." He boasted again of his love for his wife. Later that day, the defendant produced a ledger of accounts to police officers indicating which customers came to the store to pay and the type and amount of each payment. He pointed to a list of approximately seven or eight customers that he said had been in the store and did business the previous day. He also recited a number of details concerning their activities.

During the autopsy the medical examiner identified twenty-nine puncture wounds in the left front chest area, sixteen more scattered in the area of the neck, a three-inch scratch across the front of the neck, two abrasions about the forehead and eyebrow, the splitting of both lips on the right side, and bruises and abrasions on the face. He also testified that the injuries had been sustained shortly before death. The entire surface of the neck was bluish and contused, with evidence of internal

bruises in the area of the larynx and the hyoid bone at the base of the tongue. This bruising indicated a blunt injury consistent with a squeezing of the neck by a hand or hands, or by an arm. At least six wounds penetrated the heart itself. The medical examiner considered these wounds to be consistent with punctures caused by an icepick or a very thin screwdriver. He also observed that the victim was approximately five months pregnant. He found no evidence of sexual trauma. In his opinion, death occurred between two and five hours prior to the discovery of the body, that is, between 12:10 P.M. and 3:10 P.M.

An investigation in the neighborhood revealed that one neighbor had seen the defendant's motor vehicle and the victim's motor vehicle parked on the street near the house that morning. When she returned at about 11 A.M., she noticed that both vehicles were gone. At about 11:45 A.M. she noticed a van stop for a moment at the defendant's house but she was only able to get a glimpse of the man who went to the defendant's door and then left. She saw the defendant on this day when she went to the front door to receive the mail from her postman shortly after 1 P.M. She saw the defendant approach his house while rolling up his right shirt sleeve. She saw him entering his house wearing a striped shirt which was familiar to her. The defendant took his mail, said nothing to the postman, looked at this neighbor, and then continued to his door. The postman corroborated this neighbor's testimony.

Amin Rabah Hamdi and David Mocarquer, his bookkeeper, contradicted the defendant's account of his activities on the day of the murder. Hamdi returned to the store about noon and observed the defendant with a guest from New York and with David Mocarquer. The defendant then left the store and returned about 12:30 P.M. Mocarquer recalled that the defendant was not in the store from 1 P.M. until Mocarquer left at 1:45 P.M. Neither he nor Hamdi knew where the defendant had gone. Finally, the defendant, Hamdi, and his chauffeur left about 2 P.M. and spent the next two hours making collections on customer accounts. After his return, Hamdi and the defendant remained at the store until the defendant left to pick up his children at the day care center. Hamdi told the defendant that

he wished to take his sister (the victim) shopping. When he mentioned it a second time, the defendant appeared nervous and suggested that they all go together later. When the defendant was leaving to pick up the children, Hamdi asked why the victim had not picked up the children and the defendant replied that she was sick.

Both Hamdi and Mocarquer testified that the defendant had changed shirts between the morning and the afternoon of July 28. Early in the day, the defendant was wearing a striped shirt but by late afternoon he was wearing a green shirt with small flowers on it.

There was evidence that the defendant had threatened to kill his wife and had told certain people about his intention. He persuaded a friend to purchase an icepick which remained in the defendant's van until the day before the murder. He borrowed a leather punching tool the day before the murder. The defendant struck the victim about two months before the murder and called her a whore. On another occasion, the defendant hit his wife and declared, "I will kill you, I will drink your blood, I will make your death the worst." About one month before the murder, the defendant tried to procure a gun in order to kill his wife. This was not his first such attempt and he had not been taken seriously in the past. On this occasion, the defendant demanded the gun as soon as possible and offered to pay $2,000 to have his wife killed. He also offered his former driver $2,000 to kill the victim and repeated this request about ten times. He complained about his wife and indicated that he was having trouble with her. He rejected a suggestion to get a divorce by claiming that in his country there was no divorce. The defendant said that the people of his country "have their own way of doing things." The defendant said that his wife should die and that he was going to kill her. He stated that his wife was "a whore and she was pregnant and it wasn't his."

The jury were warranted in concluding from this evidence that the defendant had murdered his wife. While it is true that there were no eyewitnesses to the killing, it is equally true that the Commonwealth need not "prove that no one else could

have committed the murder." *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). We must look at the evidence as a whole and not examine exhaustively each piece of evidence separately. Here, the defendant within a short period of time before the murder acquired two instruments capable of bringing about the kind of death that the victim suffered. The medical examiner said that the puncture wounds were consistent with the use of these tools. There was testimony placing the defendant at the scene during the time period when death occurred. Both a neighbor and the postman saw him go to his house at a time consistent with Hamdi's estimate of when the defendant left his store, which was only minutes from his home. The scratches on the defendant's neck, face, and collar bone were consistent with injuries which may have been inflicted by the victim's last struggle. The clamping of her neck with an arm or a hand was consistent with the inference that the murderer seized the victim from behind and drove the weapon into her chest. The jury were not required to believe that the defendant's scratches were the result of his mourning. The jury could infer that the defendant changed his shirt after the murder to conceal the blood that might have been on it before he returned to the store and the jury were warranted in believing that he lied to the police when he said that he did not return home until evening, or did not change his clothes during the day. Taken together, this mosaic of evidence consisting of physical evidence, the tools, the physical abuse of the victim by the defendant shortly before the murder, the threats to kill her, the repeated offers of money to others to kill her, warranted the jury in returning their verdict, and hence there was no error in denying the defendant's motion for a required finding.

2. *Evidence*.

a. *Prior recorded testimony*. During the Commonwealth's case-in-chief, earlier testimony of two witnesses, Edwin Mercado and Jesus Rosario, who were declared unavailable, was admitted. Their testimony was heavily damaging because each testified that the defendant offered him $2,000 to murder his wife. The defendant argues that this was error. We do not agree.

Mercado had testified at the first trial and he agreed to return for the second trial.[3] The defendant's objection to the introduction of Mercado's prior testimony was that the Commonwealth failed to establish a good faith effort to locate Mercado. Lawrence police Lieutenant Joseph Golden described during voir dire his efforts to locate Rosario, who had disappeared after testifying at the probable cause hearing but before the first trial.[4] After cross-examination of Golden, the judge ruled that Rosario was unavailable and the defendant made no objection to this ruling.

The introduction in evidence of prior recorded testimony implicates directly the right of confrontation, under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The Sixth Amendment right "of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Pointer* v. *Texas*, 380 U.S. 400, 403 (1965). The pith of this right of confrontation is the right of cross-examination. *Davis* v. *Alaska*, 415 U.S.

---

[3] Mercado disappeared. Lieutenant Joseph Golden, of the Lawrence police department, searched but failed to locate him. He was in touch with Mercado's brother-in-law, a California attorney, who told Golden where Mercado had been living in California, but he thought that Mercado had moved to Texas a few months earlier. The brother-in-law also referred Golden to another sister who confirmed that Mercado was in the Dallas area. She said that Mercado did not communicate with his family after leaving California. Golden communicated with a police liaison officer in Dallas, providing him with identifying information about Mercado, his wife, and his school age child, but the Dallas authorities were unable to locate him. Golden also checked with the office of the division of employment security in Lawrence.

[4] Golden checked the records of the local office of the division of employment security, death records, and voting records in Lawrence. He spoke to local businessmen known to hire Hispanics and he checked various clubs frequented by Hispanics. The police did locate a woman who had lived with Rosario as his wife and she told the police that he had moved to California about eighteen months earlier. The United States Postal Service had no forwarding address other than his 1978 address. Local police knew Rosario because there were outstanding warrants for him. The probation department was also unsuccessful in locating him. The local Social Security office was part of the investigation and the police investigated aliases used by Rosario in the search of the Social Security records. A check through the Registry of Motor Vehicles was also unavailing.

308, 315-316 (1974). *Douglas* v. *Alabama*, 380 U.S. 415, 418 (1965). 5 J. Wigmore, Evidence § 1395, at 150 (Chadbourn rev. 1974).

Before a trial judge may properly allow in evidence the prior recorded testimony of a witness, he must be satisfied that the witness is unavailable at the time of trial (*Commonwealth* v. *Bohannon*, 385 Mass. 733, 744 [1982]), and that the party seeking the introduction of the testimony has made a good faith effort to produce the witness. *Barber* v. *Page*, 390 U.S. 719, 724-725 (1968). Contrast *Commonwealth* v. *Furtick*, 386 Mass. 477, 480 (1982). In the instant case, the judge was warranted in concluding that, as to both Mercado and Rosario, a good faith effort to locate them had been made.

The defendant argues, however, that Rosario's recorded testimony at the probable cause hearing should not have been admitted because he had no meaningful opportunity to cross-examine Rosario. The record does not support his argument. The defendant was represented by experienced counsel at the probable cause hearing on August 21 and 22, 1978. At the probable cause hearing he cross-examined Rosario without limitation. No more is required. See *Commonwealth* v. *Bohannon*, 385 Mass. 733, 748-749 (1982); *Commonwealth* v. *Mustone*, 353 Mass. 490, 493-494 (1968).

b. *The attack on the credibility of defense witnesses.* The defendant presented five witnesses from Lowell who testified that they saw the victim between 12:30 P.M. and 2 P.M. on the day of the murder. Four of the five said that they had been interviewed as prospective witnesses during the prior week. The fifth referred to a meeting approximately three weeks earlier. They each testified that she came to their homes to collect money due on their accounts. Six witnesses from Lawrence testified that they made payment to the defendant at his store on July 28, between 2:30 and 5 P.M. There is no indication that any of these eleven witnesses testified at the first trial, yet all of them protested that they had known the defendant and the victim and for a considerable period of time. None of these witnesses was among the names which the defendant gave to a State trooper at his store on the day after the murder.

At that time, the defendant pointed to a list of seven or eight customers who, he said, had been in the store on the previous day. The assistant district attorney cross-examined each witness and elicited from some of them that they did not testify at the first trial.

The defendant argues for the first time on appeal that this species of cross-examination is highly improper without prior testimony laying a foundation of the scope prescribed in *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981), where the court stated, "[T]he prosecutor should lay a foundation for this type of cross-examination by first establishing that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, that the witness had reason to make the information available, that he was familiar with the means of reporting it to the proper authorities, and that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so."

One glaring weakness in the defendant's argument is that it was not raised at trial and no objection on these grounds was asserted. In fact, the defendant interposed only one objection. This occurred when the first of the eleven witnesses testified, and it was not a *Brown*-inspired objection. Therefore, our inquiry must be, if we find error, whether there has been a substantial risk of a miscarriage of justice in admitting this evidence. *Commonwealth* v. *Monsen*, 377 Mass. 245, 246 (1979). Even if we assume there was an error, there has been no substantial risk of a miscarriage of justice. The cross-examination sought to highlight the unreliablity of the witnesses' memory after a lapse of almost three years since the date about which the witnesses were testifying. The eliciting of the fact that the witnesses did not testify at the first trial appears to be a mere by-product of such cross-examination.

c. *Evidence of bad character*. The defendant argues that it was error to permit the introduction of evidence of his bad character.

Hamdi testified that about two months before the murder the defendant heaped a stream of obscene abuse on the victim. There was no objection to this testimony. Hamdi also related

an incident which occurred just days before the murder where the defendant struck his son and the victim objected, saying that it was shameful to strike the son in the presence of others. The defendant retorted to the victim, "I will kill you, I will drink your blood, I will make your death the worst." When Hamdi scolded the defendant, the victim told Hamdi to "[l]eave him alone. This is the usual with him." No objection was interposed, nor does the defendant argue on appeal that there was any error.

However, during cross-examination of Hamdi, when the defendant was probing the financial relationship between the witness and the defendant, Hamdi said that during a visit to Jordan in 1976, the victim said that the defendant had gone into bankruptcy and owed money to his creditors. No objection was made, but, on appeal, the defendant argues that the reference to bankruptcy should have been struck. There was no motion to strike, nor was there any request for a curative instruction. In these circumstances, we conclude there is no reversible error.

Another claim of error arises out of the cross-examination of David Mocarquer, the defendant's bookkeeper. He testified that the defendant tried to pay him a salary "under the table," but he refused. No objection nor motion to strike was made to this evidence. There is no reversible error. Counsel's strategy may have been to refrain from objecting to both Hamdi's and Mocarquer's testimony to show the bias of both witnesses against the defendant.

Joyce Rosinski described the defendant's visit on the day before the murder. She said that, when her five-year old daughter kissed her, the defendant became irate and pushed the child aside. The defendant objected. She had already testified without objection that, during this visit, the defendant had borrowed a leather punching tool of a type which was consistent with its being the murder weapon. When the defendant saw the little girl kiss her mother, he spewed a series of complaints about the victim and ended with a vow to kill her. The defendant objects only to the testimony of his reaction to the child's kissing her mother. There is no merit to this claim because it is simply part of an otherwise admissible narrative.

We have examined the other claims of error as to evidence of bad character and find no error.

3. *The Appointment of the Interpreter.*

The defendant argues that it was error to appoint an interpreter for Hamdi because it was not necessary. The argument continues that, even if necessary, the interpreter's competency and impartiality were questionable.

The judge conducted a colloquy with Hamdi who said that he understood only some English and that he thought that it would be helpful to communicate his answers to the interpreter who could, in turn, convey them to the jury. The interpreter was fluent in Arabic and could understand the witness's answers in that language. The defendant did not object. In the circumstances, the judge was well within his orbit of discretion in appointing an interpreter. See *United States* v. *Carrion*, 488 F.2d 12, 14 (1st Cir. 1973), cert. denied, 416 U.S. 907 (1974).

Similarly, the qualifications of an interpreter fall within the area of the judge's discretion. This interpreter's academic background and experience were impressive. He acknowledged his duty to be an impartial interpreter and the fact that he had talked with the witness before trial about the case does not disqualify him. The judge was satisfied that he was impartial and nothing in the record indicates that he made errors interpreting. There was no abuse of discretion. See *In re RR*, 79 N.J. 97, 120-121 (1979).

4. *Contingent Fee.*

The defendant argues that he was denied effective assistance of counsel because of a conflict of interest arising out of a prohibited contingent fee arrangement. We need not examine the merits of the claim because no contingent fee agreement existed.

Trial counsel was appointed by a Superior Court judge under G. L. c. 277, § 55 (1984 ed.), which provides that a judge sitting upon an indictment for murder may allow reasonable compensation for the services of assigned counsel if the defendant is otherwise unable to procure counsel. Apparently, after the appointment, an insurance policy on the victim's life in the amount of $75,000 came to light and counsel conferred

with the judge who appointed him (not trial judge). It appears that the appointing judge indicated that if the proceeds were paid to the defendant, which would probably occur only if the defendant were acquitted, trial counsel should then be paid from those proceeds and, therefore, would be ineligible to receive public funds. There was a similar understanding concerning an investigator who had been retained by trial counsel. See G. L. c. 277, § 56 (1984 ed.).

The Commonwealth correctly argues that this understanding pertained only to the source of the fee. This understanding is not within the intendment of S.J.C. Rule 3:05 (3), as appearing in 382 Mass. 762 (1981), which provides that "[n]o contingent fee agreement shall be made (a) in respect of the procuring of an acquittal upon or any favorable disposition of a criminal charge." There appears to be not even a potential conflict of interest, absent a showing that trial counsel was motivated to seek an acquittal at any cost. In fact, the appointing judge was simply pointing out that the defendant should bear the burden of his reasonable counsel fees if he became able to do so. This is entirely consistent with sound public policy. See *Fuller* v. *Oregon*, 417 U.S. 40, 53-54 (1974).

5. *Review Under G. L. c. 278, § 33E.*

We are asked to order a new trial under G. L. c. 278, § 33E, because of claimed errors of law already discussed and because the verdict is against the weight of the evidence. We decline to grant this relief for reasons already set forth and because the verdict is entirely responsive to the evidence.

*Judgment affirmed.*