NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08464


COMMONWEALTH  vs.  CHARLES ROBINSON.



Barnstable.     May 10, 2019. - July 31, 2019.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Evidence, Identity, Consciousness of guilt, Motive,
     Prior misconduct.  Jury and Jurors.  Practice, Criminal,
     Jury and jurors, Interrogation of jurors, Voir dire,
     Argument by prosecutor, Capital case.



Indictment found and returned in the Superior Court
Department on May 1, 2000.

The case was tried before Gerald F. O'Neill, Jr., J.


Joseph F. Krowski for the defendant.
Elizabeth A. Sweeney, Assistant District Attorney, for the
Commonwealth.


BUDD, J.  On the evening of February 24, 2000, Edward
Figueroa was found dead at his girlfriend's home.  On August 21,
2000, the defendant was convicted of murder in the first degree
on theories of deliberate premeditation and extreme atrocity or

cruelty in connection with the victim's shooting death.[1]  After full consideration of the trial record and the defendant's arguments, we affirm the defendant's conviction, and we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.[2]

Background.  We summarize the facts as the jury could have found them, reserving certain details for discussion of specific issues.

The victim, who lived with his girlfriend in Dennisport, was friends with, and sold marijuana for, the defendant. Because the victim's car was not registered, he had to rely on friends to drive him to the defendant's apartment in Fall River to pick up marijuana to sell, and sometimes had "a hard time getting a ride."  One to two weeks prior to the victim's death, the victim received rides to Fall River from two different friends, one of whom observed the defendant in possession of a revolver approximately five days before the victim was killed.

On the evening of February 24, 2000, the defendant was visiting the victim at the victim's girlfriend's home in Dennisport.  Hours before the victim was shot and killed, the

---

[1] The defendant was also convicted of assault and battery by means of a dangerous weapon.  The indictment underlying this conviction was placed on file.

[2] The defendant filed an amended motion for a new trial, on June 2, 2014, which remains pending in the Superior Court and is not part of this appeal.

victim's girlfriend overheard the defendant berating the victim for failing "to get [his] car on the road." Although the victim apologized, saying, "Sorry, Dog. . . . I didn't mean to offend you," the defendant told the victim, "I should slap your face. I should just punch you in the mouth." Sometime after 9 P.M., the victim's girlfriend left the two men alone in the living room of the apartment.

At approximately 10:15 P.M., two neighbors heard several gunshots, and a third neighbor heard a motor vehicle speeding away. The victim's girlfriend returned at approximately 10:30 P.M., at which time she noticed that the defendant's car was gone and the front door to her apartment was partially open. When she entered the living room of the apartment, she saw that the victim was dead in a chair that had been tipped backward onto the floor.

The victim suffered two gunshot wounds to his head, including through the left eye and the left temple. Blood spatter suggested that the victim was on his back on the ground when he was shot in the head by someone positioned to the victim's left. The wounds indicated that the firearm was between six inches and three feet from the victim's head when it was fired. The victim also had gunshot wounds to his left arm and right hand, his upper chest, and his left lower leg.

A ballistician determined that the five projectiles recovered from the victim's body were all .38 caliber and were consistent with having come from the same weapon, likely a revolver, as no shell casings were recovered from the scene.

Cell site location information (CSLI) indicated that the defendant made cellular telephone (cell phone) calls on the night of the murder between 11:29 P.M. and 1:41 A.M. The first of the calls was initiated in Mattapoisett. Investigators determined that it would have taken approximately fifty-nine minutes to travel from the victim's home to Mattapoisett. Thus, the defendant could have left the victim's apartment at approximately 10:15 P.M. and arrived in Mattapoisett approximately fourteen minutes before making his first telephone call at 11:29 P.M.

The defendant's girlfriend initially told investigators that the defendant had arrived at her apartment at 8 P.M. on the night of the murder. However, at trial she testified that she did not know what time the defendant had arrived at her home that night. She further testified that, on the morning following the murder, the defendant said to her, "I was here last night, right? . . . About 8:00, right?" This caused her to believe something was going on, and to tell the police that he got home at 8 P.M. on February 24.

Weeks later, when the defendant was being held prior to trial, he had an argument with his cellmate, during which the defendant threatened to kill the cellmate. When the cellmate responded that the defendant was not going to kill him because the defendant did not have a gun, the defendant said essentially, "That's what the other guy thought."

The defendant's theory of the case was that a third party, Ryan Ferguson, killed the victim. On the night prior to his death, the victim punched Ferguson several times in the head as Ferguson sought to confront the defendant about the defendant's attempt to flirt with Ferguson's girlfriend. Ferguson later telephoned a friend seeking access to a firearm, and vowed to get revenge against the victim. However, there was no evidence that Ferguson ever obtained a firearm, and there was testimony from witnesses that he was with others at the time that the victim was killed.

Discussion. 1. Sufficiency of evidence. The defendant argues that the judge erred in failing to allow his motion for a required finding of not guilty at the close of the Commonwealth's case. He claims that the evidence presented was insufficient to support the conviction of murder in the first degree because his identification as the shooter was "left to speculation." In considering this claim, we must view the evidence presented at trial, together with reasonable inferences

therefrom, in the light most favorable to the Commonwealth to determine whether any rational jury could have found each element of the offense beyond a reasonable doubt.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  As discussed infra, we conclude that the Commonwealth met its burden with respect to proving beyond a reasonable doubt that the defendant was the killer and that he acted with premeditation as well as with extreme atrocity or cruelty.

We acknowledge that the identification evidence was circumstantial; however, "a conviction may rest upon circumstantial evidence alone, and the inferences a jury may draw from the relevant evidence need only be reasonable and possible," not "necessary or inescapable" (quotation and citation omitted).  Commonwealth v. Martin, 467 Mass. 291, 312 (2014).  Here, the evidence presented would allow a rational fact finder to conclude beyond a reasonable doubt that the defendant shot the victim several times with his revolver and fled to his girlfriend's home in Fall River.  See Commonwealth v. Cohen, 412 Mass. 375, 380 (1992) ("absence of direct proof by way of an eyewitness who saw the defendant shoot the victims is not damaging to the Commonwealth's case so long as there is competent circumstantial evidence that establishes the defendant's guilt").

Testimony was presented that allowed the jury to conclude that the victim sold drugs for the defendant on a regular basis. Because the victim's car was unregistered, he relied on friends to drive him from Dennisport to where the defendant lived in Fall River to replenish his supply, and the victim sometimes had trouble with transportation. The jury could have inferred that the defendant was not happy with this arrangement, given the testimony from the victim's girlfriend that when the defendant came to visit the victim the defendant told her that he was there "to find out where [the victim's] head was at." The girlfriend further testified that the defendant expressed anger that the victim was unable to "get [his] car on the road," and threatened the victim with physical violence.

The victim's girlfriend left the defendant and the victim alone sometime after 9 P.M. on the night of the killing. At approximately 10:15 P.M., neighbors heard gunshots and a motor vehicle speeding away. When the victim's girlfriend returned at approximately 10:30 P.M., she found the defendant and his car gone, and the victim dead from gunshot wounds. The Commonwealth introduced CSLI data that was consistent with its argument that the defendant shot the victim and thereafter traveled south to Fall River. In addition, the ballistic evidence indicated that the bullets removed from the victim's body were all of the same caliber and likely fired from the same weapon, a revolver; a

witness testified to seeing the defendant with a revolver five days before the killing.  See Commonwealth v. McGee, 467 Mass. 141, 155-156 (2014) (evidence that defendant possessed firearm consistent with weapon used in shooting admissible to demonstrate defendant had means to commit crime).

Moreover, the jury could infer that the evidence presented demonstrated consciousness of guilt.  See Commonwealth v. Morris, 465 Mass. 733, 736-738 (2013) (although consciousness of guilt alone not sufficient to sustain conviction, such evidence may be used, along with other evidence, to establish proof of guilt beyond reasonable doubt).  The defendant's girlfriend testified that on the morning following the murder, the defendant said, "I was here last night, right? . . .  About 8:00, right?," suggesting that he wanted investigators to believe that he arrived at her home much earlier than he actually did.  In addition, two witnesses from the Barnstable County house of correction testified that, weeks after the shooting, the defendant alluded to having killed the victim.

Thus, the Commonwealth demonstrated that the defendant had the motive, opportunity, and means to kill the victim, as well as consciousness of guilt.  See Commonwealth v. Emeny, 463 Mass. 138, 151 (2012) (evidence sufficient to convict where Commonwealth provided evidence of motive, means, opportunity, and consciousness of guilt).  Although any one piece of evidence

by itself would not have provided sufficient evidence of the defendant's identity as the person who shot the victim, taken as a whole, the evidence supports such a finding beyond a reasonable doubt.  See Commonwealth v. Javier, 481 Mass. 268, 283 (2019), quoting Commonwealth v. Salim, 399 Mass. 227, 233 (1987) ("evidence taken together may form proof of crime where any individual fact, taken alone, does not").

In addition to having presented sufficient evidence for the jury to have found beyond a reasonable doubt that the defendant was the shooter, the Commonwealth also presented sufficient evidence that the defendant killed the victim with deliberate meditation as well as with extreme atrocity or cruelty.  To prove murder in the first degree on a theory of deliberate premeditation, the Commonwealth must show beyond a reasonable doubt that the defendant intentionally caused the victim's death and that he decided to kill after a period of reflection.  Commonwealth v. Whitaker, 460 Mass. 409, 418 (2011).  "No particular period of reflection is required for deliberate premeditation to be found.  The law recognizes that a plan to murder may be formed within a few seconds" (citation omitted).  Commonwealth v. Chipman, 418 Mass. 262, 269 (1994).  Deliberate premeditation can be inferred from the bringing of a firearm to the scene of the killing, Commonwealth v. Williams, 422 Mass. 111, 122-123 (1996) (defendant brought loaded revolver to

victim's apartment), or from the nature and manner of the injuries inflicted, Commonwealth v. Anderson, 396 Mass. 306, 312 (1985) (defendant fired five shots, two of which struck victim).

To prove extreme atrocity or cruelty, the Commonwealth must demonstrate one or more of the so-called Cunneen factors:

> "(1) whether the defendant was indifferent to or took pleasure in the victim's suffering; (2) the consciousness and degree of suffering of the victim; (3) the extent of the victim's physical injuries; (4) the number of blows inflicted on the victim; (5) the manner and force with which the blows were delivered; (6) the nature of the weapon, instrument, or method used in the killing; and (7) the disproportion between the means needed to cause death and those employed."

Commonwealth v. Linton, 456 Mass. 534, 546 n.10 (2010). See Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). The Commonwealth presented evidence that the victim, who had been struck by five bullets, was found in a chair that had tipped backward onto the floor with gunshot wounds to his head, chest, arm, hand, and leg. The jury could have found from this evidence that the victim saw that he was about to be shot, attempted to defend himself, and was propelled backward by the initial shots fired. Further, the evidence also allowed an inference that the shots to his head were fired at close range after he had fallen back in his chair. Thus, when viewed in the light most favorable to the Commonwealth, the jury could have found at least one of the above factors. See, e.g., Commonwealth v. Alicea, 464 Mass. 837, 853 (2013) (extreme

atrocity or cruelty found where victim was shot as he turned to flee and suffered from multiple gunshot wounds including fatal head wound).

2.  Juror issues.  The defendant contends that the judge mishandled two issues that arose in connection with two sitting jurors.  As discussed infra, we perceive no reversible error.

a.  Juror no. 2-7.  On the morning of the third day of trial, juror no. 2-7, an African-American woman, expressed concern about her bias to a court officer, who in turn notified the judge.  After conferring with the parties, the judge held a colloquy in his chambers outside the presence of the parties.  During the colloquy, the juror explained that she "was really angry" with some of the witnesses because she saw them as "refus[ing]" to "avail themselves of the opportunities out there."  The juror also mentioned with disapproval a tattoo on the neck of one of the witnesses, which, according to the juror, was the Chinese character for "mouth," "joy to the mouth," or "repeatedly."  The juror further stated that she "tried to set aside [her] own past and [her] own biases, but they [kept] coming to the forefront."

When asked whether she had shared her thoughts with any of the other jurors, the juror stated that she spoke with two other jurors, who were educators like herself, "in general" about "the decline of student values, morals, et cetera -- parental care,"

and that she had told a juror that the witness's tattoo meant "mouth, to the mouth, or repeatedly." The entire exchange between the juror and the judge was transcribed by the court reporter and read back verbatim to the parties immediately after the colloquy, and after a discussion with counsel, the judge excused the juror. The judge declined, however, to inquire of the remaining jurors whether they were exposed to, or had been affected by, juror no. 2-7's biases.

    i. Exclusion from juror colloquy. Although trial counsel did not object to being excluded from the colloquy with juror no. 2-7 at the time it took place, the defendant now argues that the exclusion was reversible error. We disagree.

    "When a judge conducts an inquiry about a consequential matter, such as alleged serious misconduct of jurors, there is a requirement, deriving from the constitutional right of confrontation, that the defendant and his counsel be present." Commonwealth v. Angiulo, 415 Mass. 502, 530 (1993), and cases cited. However, the defendant may waive the right by not making a request to be present for the inquiry. Commonwealth v. Dyer, 460 Mass. 728, 738 (2011), cert. denied, 566 U.S. 1026 (2012).

    Here, because the defendant did not object to being excluded from the in-chambers interview of juror no. 2-7, we review the judge's actions for a substantial likelihood of a miscarriage of justice. See id. at 735 n.7 (where

constitutional claim is waived, we nonetheless apply "extra level of review under G. L. c. 278, § 33E"). Although trial counsel on both sides should have been present during the judge's colloquy with juror no. 2-7, there was no reversible error.

The transcription of the colloquy was read back to the parties verbatim immediately after the colloquy occurred. See Commonwealth v. Martino, 412 Mass. 267, 286-287 (1992). The defendant does not argue now, and did not argue at the time, that the colloquy was defective, or that trial counsel would have requested a different line of questioning had he been present for the colloquy. In fact, the defendant's trial counsel characterized the judge's questioning as "wholly appropriate." The defendant had a "sufficient opportunity to evaluate the problem and to arrive at a solution that [he], at the time, thought was in his best interests," see id. at 287, even though the judge ultimately dismissed the juror over his objection. Thus, we discern no substantial likelihood of a miscarriage of justice with regard to the colloquy.

ii. Voir dire of jurors for taint. The defendant also argues that the judge should have made individual inquiry of each juror after dismissing juror no. 2-7 to ensure that, to the extent that certain jurors had been exposed to juror no. 2-7's

biases, those jurors could nevertheless be fair and impartial in deciding the case.

"When a judge determines that the jury may have been exposed during the course of trial to material that 'goes beyond the record and raises a serious question of possible prejudice,' he [or she] should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect."  Commonwealth v. Francis, 432 Mass. 353, 369-370 (2000), quoting Commonwealth v. Jackson, 376 Mass. 790, 800 (1978).  We review the judge's decision whether to conduct such a voir dire for an abuse of discretion.  See Francis, supra at 370.

Here, the juror told the judge that she had discussed with other jurors general matters, such as the decline of values and morals among young people.  The juror also said that she had told one other juror the purported meaning of the tattoo on a witness's neck.[3]  However, the juror indicated that she did not share her views on any of the individuals or issues involved in the case.  Although a voir dire of the remaining jurors may have been prudent, the judge was well positioned to assess juror no. 2-7's credibility, and it was within his sound discretion to

---

[3] The defendant's trial counsel offered that none of the possible meanings of the tattoo was "terribly pejorative either way."

credit the juror's statements and to find that the facts did not raise a "serious question of possible prejudice."  See Commonwealth v. Tennison, 440 Mass. 553, 557-558 (2003).  We conclude that there was no error.

   iii.  "Premature" jury discussions.  The defendant contends that the colloquy with juror no. 2-7 demonstrated that the jury had engaged in "premature discussions" about the case prior to the conclusion of evidence, closing arguments, and the judge's final instructions, depriving the defendant of his constitutional right to a fair and impartial jury.  See Commonwealth v. Philbrook, 475 Mass. 20, 30 (2016); United States v. Jadlowe, 628 F.3d 1, 17-18 (1st Cir. 2010), cert. denied, 563 U.S. 926 (2011), citing United States v. Resko, 3 F.3d 684, 688-689 (3d Cir. 1993).  He further argues that the judge's instructions to the jury that it was not essential to avoid discussing the case prior to deliberations was reversible error.  We disagree.

   Although "it is improper for jurors to discuss a case prior to its submission to them (citation omitted)," Jadlowe, 628 F.3d at 15, contrary to the defendant's assertion, there was no indication that any members of the jury expressed a point of view about the evidence or what the outcome of the trial should be.  See id. at 18 ("not all premature jury discussion about a case will compromise a defendant's fair trial rights,

particularly where the conversation does not reflect a point of view about the evidence or the outcome").

Here, juror no. 2-7 specifically told the judge that she had <u>not</u> discussed her views on any issues or individuals involved in the case.  In fact, other than explaining the meaning of a witness's tattoo to one juror, there is no indication that juror no. 2-7 discussed any of the witnesses or the case at all.  Rather, she said that she had talked with two other jurors, who were also in the education field, about the decline of values and morals among young people generally.  Because these topics were, at best, ancillary to facts at issue in the trial, the judge was not required to address the matter with the remaining jurors.  See <u>Commonwealth</u> v. <u>Maldonado</u>, 429 Mass. 502, 506-507 (1999), and cases cited (trial judge has "discretion in addressing issues of extraneous influence on jurors discovered during trial").

Nevertheless, the judge gave the following instruction to the jury at the end of the day on which juror no. 2-7 was dismissed:

> "Members of the jury, please remember my four admonitions. Keep an open mind.  Don't discuss the case with anybody until you have completed your jury service.  Don't discuss the case among yourselves.  Some information has come to me that the jury was discussing the matter.  Again, I think it's very important -- not essential, but very important that you do not.  Wait until you have heard the entire case.  Do not read anything about the case, look at

anything about the case, or listen to anything about the case until you have completed your jury service."

It was error to instruct the jury that avoiding discussion of the case prematurely (i.e., after all evidence had been admitted, closing arguments, and final instructions) was "not essential."  See Jadlowe, 628 F.3d at 18.  However, as there was no indication that jurors had deliberated prematurely about the outcome of the case prior to the instruction, there is no reason to believe that they would do so after the judge's instruction, especially where he told the jurors that it was "important" not to discuss the case.  We conclude that the error did not result in a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Santos, 454 Mass. 770, 772 (2009).

b.  Juror no. 1-5.  At the end of the third day of trial, juror no. 1-5 informed a court officer that her son was at the same house of correction as Ferguson, who had testified that day and who was the individual that the defendant alleged was the actual killer.  The juror was worried that the witness could "[g]et to her son"; the court officer observed that the juror was "really upset."  The judge did not speak with the juror directly; instead, he asked the court officer to reassure the juror that "there wouldn't be any problems" and "to inform the House of Correction of the situation."  However, the judge did not "see . . . why [Ferguson] would be upset with [the juror's

son] or anything else."  He informed the parties that the juror did not give any indication that the situation would affect her ability to be a juror, and the defendant's trial counsel did not object to the judge's course of action.

The defendant argues on appeal that the judge should have conducted a voir dire of juror no. 1-5.  It is within the judge's sound discretion to find that there exists "a substantial risk of extraneous influences on the jury," and to inquire accordingly.  See Commonwealth v. Boyer, 400 Mass. 52, 55 (1987), and cases cited.  Here, the record demonstrates that the judge was warranted in concluding that reassuring the juror of her son's safety and anonymity was adequate.  See Commonwealth v. Federici, 427 Mass. 740, 747 (1998), and cases cited ("'serious question of possible prejudice' did not exist such as to require individual voir dire").  There was no error.

3.  Character evidence.  The defendant argues that the judge should not have admitted evidence over his objection that, in the weeks prior to his death, the victim traveled to Fall River to obtain marijuana from the defendant.  According to the defendant, sufficient context for the killing already was provided by evidence relating to the argument between the defendant and the victim.  Furthermore, the defendant argues that the unfair prejudice of the drug transaction evidence was

exacerbated by the frequency with which the prosecutor referred to it during closing argument.  We disagree.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Mass. G. Evid. § 404(b)(1) (2019).  See Commonwealth v. Helfant, 398 Mass. 214, 224 (1986), and cases cited.  However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Mass. G. Evid. § 404(b)(2).  See Helfant, supra.  "Even if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant."  Commonwealth v. Crayton, 470 Mass. 228, 249 (2014), and cases cited.  "We give great deference to a trial judge's exercise of discretion in deciding whether to admit a prior bad act, and we will reverse for an abuse of discretion only where the judge made 'a clear error of judgment in weighing the factors . . . such that the decision falls outside the range of reasonable alternatives'" (quotation omitted).  Commonwealth v. Veiovis, 477 Mass. 472, 482 (2017), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Here, the Commonwealth offered the evidence of the defendant's drug sales to show motive -- that is, to suggest that the defendant was angry at the victim for having strangers drive him to and from the drug transactions -- and the judge instructed the jury accordingly. The jury also heard evidence that the victim needed rides from others because his own car was not registered; prior to the killing, the defendant was overheard telling the victim, "That's why I told you to get the car on the road." The judge later offered to instruct the jury again on the proper use of prior bad acts evidence, and the defendant declined. In sum, the drug transactions provided additional context to the relationship between the defendant and the victim that would not have been available from testimony about their argument alone. Thus, we discern no error in the judge's decision to admit the prior bad acts evidence. See Commonwealth v. Horton, 434 Mass. 823, 828 (2001) (evidence of defendant's drug dealing admissible to show motive and relationship between defendant and victims). See also Commonwealth v. Walker, 460 Mass. 590, 612-613 (2011) (same).

4. Closing arguments. The defendant argues that the following excerpt from the Commonwealth's closing argument was without basis in the evidence:

> "[The victim] was a drug dealer for [the defendant]. He
> went to Fall River to [the defendant's girlfriend's] house
> on a regular basis to get drugs. [Two witnesses] tell us

that.[4]  And [the victim] <u>acted as a bodyguard</u> for [the defendant], interceding even when [the defendant] was being challenged by the boyfriend of a girl who he decided he wanted."  (Emphasis added.)

Prosecutors are "entitled to marshal the evidence and suggest inferences that the jury may draw from it."  See <u>Commonwealth</u> v. <u>Tassinari</u>, 466 Mass. 340, 355 (2013).  The prosecutor also may suggest "what conclusions the jury should draw from the evidence."  See <u>Commonwealth</u> v. <u>Ferreira</u>, 381 Mass. 306, 316 (1980).  However, it is impermissible to "misstate the evidence, to refer to facts not in evidence . . . , to use evidence for a purpose other than the limited purpose for which it was admitted, or to suggest inferences not fairly based on the evidence."  Mass. G. Evid. § 1113(b)(3)(A).  See <u>Commonwealth</u> v. <u>Beaudry</u>, 445 Mass. 577, 580 (2005).  Because the defendant did not object to the challenged argument at trial, we review for a substantial likelihood of a miscarriage of justice.  <u>Commonwealth</u> v. <u>Smith</u>, 449 Mass. 12, 17 (2007).

We disagree with the defendant's assertion that there was no evidence that the victim went to Fall River for drugs "on a regular basis" and that the victim was the defendant's "bodyguard."  Two witnesses testified that they drove the victim

---

[4] The defendant also argues that there was no evidence that these two witnesses, who provided the victim with transportation to Fall River, were "working together."  We see nothing in the Commonwealth's closing argument suggesting that they were.

to Fall River to obtain drugs from the defendant; one witness testified that he drove the victim "a lot." There was also testimony that when Ferguson attempted to confront the defendant about the defendant's comments regarding Ferguson's girlfriend, the victim attacked Ferguson while the defendant watched. The Commonwealth's closing argument suggested fair inferences from these facts in evidence. Thus, we conclude that the statements challenged by the defendant were proper.

5. <u>Review under G. L. c. 278, § 33E</u>. Finally, the defendant asks us to exercise our extraordinary power to grant relief under G. L. c. 278, § 33E. We have reviewed the record in its entirety and see no basis to set aside or reduce the verdict of murder in the first degree.

<u>Judgment affirmed</u>.